UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LAURA L. WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Cause No. 2:12-cv-26-WTL-WGH |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Laura L. Williams requests judicial review of the final decision of the Defendant Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). The Court now rules as follows.

**I.   PROCEDURAL HISTORY**

On January 3, 2008, Williams filed an application for DIB and SSI alleging disability beginning August 7, 2007. Williams' application was initially denied on July 7, 2008, and again upon reconsideration on September 30, 2008. Thereafter, Williams requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on June 14, 2010, before ALJ Gregory Hamel in Indianapolis, Indiana. During the hearing, Gail Franklin testified as a vocational expert. On August 25, 2010, the ALJ issued a decision denying Williams' application for benefits. The Appeals Council upheld the ALJ's decision and denied Williams' request for review on December 1, 2011. This action for judicial review ensued.

## II. EVIDENCE OF RECORD

The relevant medical evidence of record follows.

### A. Acute Medical Care

Williams began treating with Thomas H. Black, M.D., and Brian Black, D.O., of Acute Medical Care in July 2007, shortly after moving to Indiana from Texas. She visited the medical center complaining of back pain and anxiety and seeking prescriptions for Xanax and Vicodin as she had been on those medications for several years. Williams followed up with Dr. Thomas Black on August 2, 2007, after falling at work. She complained of pain in her hands and that her arms and hands went "to sleep" constantly throughout the day. Thereafter, Williams continued to treat with Dr. Thomas Black and Dr. Brian Black and regularly complained of back pain and pain radiating down one or both legs.

On September 5, 2007, after a test revealed Williams had elevated liver enzymes, Dr. Brian Black performed additional testing and diagnosed Williams with Hepatitis C. She also began taking Peri-Colace to help with intestinal issues.

During follow-up visits, Dr. Thomas Black and Dr. Brian Black continued to prescribe Peri-Colace, Miralax, Xanax, Vicodin, Ultram, and miscellaneous vitamins to treat Williams' ailments. During the follow-up visits, the doctors noted on several occasions that Williams' anxiety and back pain had improved with treatment, but that the problems were not fully resolved. On October 5, 2007, however, Williams complained to Dr. Brian Black that she felt she was unable to work due to her back pain and Hepatitis C, as well as the resulting fatigue. Thereafter, on March 10, 2008, Williams complained that the pain in her legs had worsened. At a follow-up visit on May 29, 2008, however, Dr. Thomas Black noted that the Vicodin and Xanax were "helping" with her anxiety and pain. These same sentiments were noted by Dr. Thomas

Black on April 27, 2009 and again on June 1, 2009. As of July 28, 2009, Dr. Thomas Black noted that Williams should "use caution in lifting." Tr. at 415.

### B. Psychiatric Consultative Exam – Dr. Patrick Brophy

On June 10, 2008, Williams underwent a psychiatric consultative examination with Patrick D. Brophy, Ph.D. Dr. Brophy noted in his report that Williams had been arrested for battery on three occasions and that she was expelled from school in the seventh grade. According to Dr. Brophy, Williams attempted to justify her behavior by saying "I don't like being talked down to." Tr. at 341. Dr. Brophy also reported that Williams is a "very opinionated woman who is indeed quite blunt." Tr. at 343. Dr. Brophy's notes also indicate that Williams abused methamphetamine for ten years, but that she had not used the drug for over four years. With regard to her activities of daily living, Dr. Brophy opined:

> [Williams] is able to bathe and dress herself. She does some cooking, but told me that her children help. She said that she just cannot shop for groceries because she becomes so upset. Her husband has been doing the grocery shopping. She continues to drive a car. She does no walking outside the home because of back pain. In the way of hobbies, she said that she enjoys reading mystery novels. She also watches television.
>
> [Williams'] daughter helps with her housework and does the laundry. [Williams] said she cannot do the laundry because of back pain.

Tr. at 341.

Dr. Brophy diagnosed Williams with an impulse control disorder (inability to control her anger) and a borderline personality disorder. He also assigned her a Global Assessment of Functioning ("GAF") score of 50.

### C. Physical Consultative Exam – Dr. William Kelley

On June 17, 2008, Williams underwent a physical consultative examination with William Kelley, M.D. Dr. Kelley noted that Williams "ambulates without difficulty. She climbs onto and

off the exam table without difficulty. . . . Claimant stated she was unable to lie down on the exam table. Claimant is stable at station and appears comfortable in the seated and supine positions." Tr. at 325. Dr. Kelley further noted that Williams "stated she was not able to stand on her toes and heels or squat. She was able to tandem walk. [She was] able to perform heel to shin." Tr. at 328. Based on his physical assessment, Dr. Williams concluded that Williams "may be able to do some type of daily sedentary activities that do not require lifting, stooping, bending, or climbing." Tr. at 328.

### D. Physical RFC Assessment – Dr. R. Fife

On June 27, 2008, R. Fife, M.D., reviewed Williams' medical records and completed a physical RFC assessment. Dr. Fife opined that Williams was able to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Dr. Fife believed that Williams' complaints were not as severe as she alleged. J. Sands, M.D., affirmed Dr. Fife's assessment on September 29, 2008.

### E. Mental RFC Assessment – Dr. Donna Unversaw

On July 7, 2008, Donna Unversaw, Ph.D., also reviewed Williams' medical records and completed a mental RFC assessment and a psychiatric review. Dr. Unversaw diagnosed Williams with a borderline personality disorder and an impulse control disorder, and concluded that Williams had mild limitations in activities of daily living and maintaining concentration, persistence, or pace. Dr. Unversaw also concluded that Williams had moderate limitations in the following:

- The ability to understand and remember detailed instructions;
- The ability to carry out detailed instructions;

- The ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- The ability to interact appropriately with the general public;
- The ability to accept instructions and respond appropriately to criticism from supervisors;
- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and
- Maintaining social functioning.

Tr. at 344-45; 358. Based on the foregoing, Dr. Unversaw opined that Williams "would work best doing work on her own with an understanding and considerate supervisor," and that Williams "is able to perform routine tasks in a manner so as to attend/[concentrate] and complete at a reasonable pace and with persistence." Tr. at 346. Joseph A. Pressner, Ph.D., affirmed Dr. Unversaw's assessment on September 30, 2008.

### F.  Hendricks Neurology – Dr. Jesse Li

After the consultative exams and RFC assessments were peformed, on November 4, 2008, Williams consulted with neurologist Jesse Li, M.D., regarding her lower back and leg pain and numbness in her feet. Williams complained that the Vicodin no longer eased her pain. Dr. Li noted that Williams had difficulty standing on the tip of her toes, positive bilateral straight leg raises, and tenderness in her spine between L4 and S1, right paraspinal muscles, and right gluteus muscles. On November 10, 2008, an MRI revealed a bulging disc with an annular tear at L5/S1. During a follow-up visit with Dr. Li on November 12, 2008, Dr. Li again noted that Williams suffered from the same limitations noted on November 4, 2008. Dr. Li continued the prescription for Vicodin and diagnosed Williams with lower back pain and lumber radiculopathy.

### G. Williams' Testimony

At her hearing before the ALJ on June 14, 2010, Williams testified that she spends most of her time at home. She experiences "a good deal of pain" when she sits or stands more than 20-30 minutes at a time. Williams is unable to complete most household chores and errands and usually receives help from her husband and teenage daughters.

Williams believes she is unable to work due to her back pain, anxiety, and temper. The back pain causes an "immense . . . terrible . . . horrible . . . pain" at the top of her buttocks and down her legs. Tr. at 44. Additionally, Williams' anxiety and temper cause her to experience racing thoughts and feel nervous, self-conscious, and upset. As a result, she is generally unable to get along with other people.

### III.   APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d) (1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b).[1] At step

---

[1] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by the court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

## IV. THE ALJ'S DECISION

At step one, the ALJ found that Williams had not engaged in substantial gainful activity since her alleged onset date of August 7, 2007. At step two, the ALJ concluded that Williams

7

suffers from the following severe impairments: impulse control disorder; borderline personality disorder; anxiety; obesity; and lumbar radiculopathy. At step three, the ALJ determined that Williams' severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Williams had the residual functional capacity ("RFC") to perform sedentary work[2] with the following limitations: "[T]he claimant is able to occasionally climb, balance, stoop, kneel, crouch, or crawl. The claimant cannot climb ropes, ladders, or scaffolds. Finally, the claimant is restricted to routine, repetitive tasks, which do not require public contact or more than occasional contact with coworkers." Tr. at 14. Williams, however, could not perform any past relevant work. Given the RFC finding, and taking into account Williams' age, education, and work experience, the ALJ determined at step five that Williams could perform jobs existing in significant numbers in the national economy, those being a document preparer, a pari-mutuel ticket checker, and a final assembler. Accordingly, the ALJ concluded that Williams was not disabled as defined by the Act from August 7, 2007, through the date of her decision (on August 25, 2010).

## V. DISCUSSION

Williams advances numerous objections to the ALJ's decision; each is addressed below.

### A. RFC Determination

#### 1. Dr. Kelley

Williams argues that the ALJ "improperly dismissed" Dr. Kelley's opinion that she is limited to "sedentary activities that do not require lifting, stooping, bending, or climbing," Tr. at 328.

---

[2]"Sedentary work is generally performed while sitting and requires maximum lifting of 10 pounds." Tr. at 14.

In determining Williams' RFC, the ALJ concluded that Williams was not "as limited as Dr. Kelley opine[d]." Tr. at 17. Rather, the ALJ concluded that Williams was capable of sedentary work and occasionally climbing, balancing, stooping, kneeling, crouching, or crawling. The ALJ reasoned that "bending and climbing are not required by sedentary work," and that Williams' "daily activities of driving, cooking, and washing the dishes show that she can perform occasional stooping and lifting."[3] Tr. at 17.

The Court does not believe the weight given to Dr. Kelley's opinion was improper. Other than her own subjective complaints, there is no evidence in the record to support her alleged postural limitations. Accordingly, it was not error for the ALJ to discount the opinion of the physical consultative examiner, Dr. Kelley.

### 2. Dr. Brophy

Williams also argues that the ALJ "improperly dismissed" Dr. Brophy's findings that Williams suffers from an impulse control disorder and a borderline personality disorder, and has a GAF score of 50. The Court agrees that the ALJ's weight determination in relation to Dr. Brophy requires further explanation.

In his decision, the ALJ stated that he "did not fully accept [Dr. Brophy's] determinations," because "[t]he claimant's husband indicated that her activities of daily living and general functioning are mostly restricted by physical, not mental limitations. Further, . . . the record is full of evidence showing that the claimant's mental medications have been effective." Tr. at 17.

---

[3] Williams also argues that this finding misconstrues the evidence regarding her activities of daily living. The relevant evidence, however, indicates that Williams was able to drive short distances, do some cooking, and wash the dishes for 5-10 minutes at a time.

9

Although the ALJ stated that he "did not fully accept" Dr. Brophy's determinations, the ALJ did not state what role, if any, Dr. Brophy's opinions played in his RFC determination. In other words, is Williams able to work despite Dr. Brophy's findings, or do Dr. Brophy's findings prohibit Williams from working (such that the ALJ discredited Dr. Brophy's findings entirely)? Because the Court is unable to determine the weight given to Dr. Brophy, it is unable to determine whether the weight given was appropriate, and this matter must be remanded to the ALJ for further clarification.

### 3. Dr. Fife and Dr. Unversaw

Lastly, Williams argues that the RFC was improper because the ALJ failed "to explain why any weight was given to the non-examining State-agency reviewers' physical and mental RFC assessments," Williams' Br. at 13, and that the ALJ gave too much weight to those doctors' opinions. Again, the Court agrees that the ALJ's weight discussion is lacking.

Here, the ALJ stated the following regarding the non-examining doctors:

> Although these physicians were non-examining and generally not entitled to as much weight as those of examining or treating physicians, these opinions are entitled to some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions. In particular, the undersigned finds that the experts are familiar with the rules, laws, and regulations governing the area of disability.

Tr. at 17. Although the ALJ may very well have had good reasons (grounded in the medical records) for giving the non-examining doctors more weight than the examining doctors, the Court is unable to determine from the foregoing on what the ALJ based his determination, and thus, whether that determination was appropriate. On remand, the ALJ should articulate why he afforded the non-examining doctors additional weight. *See Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000) (remanding to Commissioner where ALJ did not adequately explain why he granted greater weight to non-treating physician).

10

### B. Credibility Determination

Williams next argues that the "ALJ rendered an improper credibility determination by relying on unreasoned grounds." Williams' Br. at 14. The Court agrees that the credibility determination requires additional explanation.

With regard to Williams' subjective complaints, the ALJ must make a credibility determination using factors outlined in S.S.R 96-7p. "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, and justify the finding with specific reasons." *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). The ALJ must also consider "the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms." S.S.R. 96-7p. District courts "afford a credibility finding 'considerable deference,' and overturn [a finding] only if 'patently wrong.'" *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Carradine v. Barnhart*, 36 F.3d 751, 758 (7th Cir. 2004)). However, "the ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citations omitted).

The ALJ in this case determined that Williams' statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the determined RFC.[4] The ALJ's credibility determination, however, did not

---

[4] As is so often the case, the ALJ's credibility discussion begins with the finding that the claimants statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they are inconsistent with the ALJ's RFC assessment. The Seventh Circuit recently criticized this language as meaningless boilerplate seen frequently in decisions. It criticized this template as unhelpful and explained that it backwardly implies that the ability to work is determined first and is then used to determine the claimants credibility. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (quoting *Bjornson v. Astrue*, 671 F.3d 640,

mention or account for the side effects of the various medications that Williams takes. Williams testified that her medications cause fatigue and that sometimes the Xanax "knocks [her] out." Tr. at 48; 50. On remand, the ALJ should consider what role, if any, the side effects of Williams' medications play in his credibility determination, or explain why the alleged side effects should not be credited.[5]

### C.  Hypothetical and Vocational Expert's Response

Finally, Williams argues that the hypothetical did not account for all of Williams' limitations, and that the jobs identified by the vocational expert conflict with the ALJ's RFC. The Court agrees that the discussion surrounding the hypothetical requires additional clarification.

"When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record. . . . More specifically, the question must account for documented limitations of 'concentration, persistence, or pace.'" *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (citations omitted). Here, Williams argues, in part, that the ALJ failed to include her limitations in concentration, persistence, or pace. It is true that the state reviewing physician, Dr. Unversaw, opined that Williams had mild limitations in maintaining concentration, persistence, or pace. The Court is unable to determine, however,

---

645 (7th Cir. 2012) and citing *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010)). Credibility findings must have support in the record, and such hackneyed language seen universally in decisions adds nothing. *Shauger*, 675 F.3d at 694 (citing *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) and *Parker*, 597 F.3d at 921-22).

[5]Williams also argues that the ALJ misconstrued the evidence regarding her daily activities of living and dismissed her "credible testimony" regarding her mental impairments. The Court does not agree. The evidence in the record indicates that Williams was able to address her personal needs, water her garden, do some cooking, and wash the dishes for 5-10 minutes at a time. Further, the ALJ specifically determined that Williams' subjective complaints concerning her anxiety and constant racing thoughts were not "supported by the evidence of record." Tr. at 16.

whether the ALJ agreed with this finding. In this regard, the ALJ granted Dr. Unversaw "some weight" and adopted her opinion regarding Williams' "non-exertional limitations pertaining to routine tasks and minimal contact," Tr. at 17, but did not determine whether Williams also suffers from mild limitations in maintaining concentration, persistence, or pace. On remand, the ALJ should make clear his finding on whether Williams does, in fact, have mild limitations in maintaining concentration, persistence, or pace. If the ALJ agrees with Dr. Unversaw's finding, the ALJ should revise the hypothetical to account for the limitation.

Furthermore, as noted above, on remand, the ALJ has been instructed to further develop his discussion of the weight given to Dr. Brophy and the non-examining doctors. To the extent his original RFC is affected by his assessment, the ALJ should revise the hypothetical accordingly.

Notwithstanding the foregoing, Williams also argues that the hypothetical was improper because the ALJ's instruction that the hypothetical person be allowed to "get up for a few minutes" every 30 minutes is not addressed by the *Dictionary of Occupational Titles* ("DOT"). Tr. at 57. Thus, according to Williams, it was "harmful error" for the ALJ to include the limitation in his hypothetical. Williams' Br. at 17. Sit/stand limitations, however, are permissible and do not automatically rule out all employment. *See, e.g., Ketelboeter v. Astrue*, 550 F.3d 620 (7th Cir. 2008) (sit/stand option was appropriate).

Williams further argues that the jobs identified by the vocational expert (i.e., a pari-mutuel ticket checker, a document preparer, and a final assembler) conflict with the ALJ's RFC determination. The Court is unable to find that the jobs identified by the vocational expert – based on the ALJ's original RFC assessment – were improper. As noted above, however, the ALJ's RFC finding requires additional clarification. Accordingly, if, on remand, the ALJ revises

13

his RFC determination and/or the hypothetical, a new determination of the jobs Williams is capable of performing (if any) will be necessary.

## VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED: 03/13/2013

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.